IN THE UNITED STATES DISTRICT COURT IN AND FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **LARRY PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 05-CV-0550-CVE-FHM** |
| | ) | |
| **TOWN OF CHELSEA, KENNY WEAST,** | ) | |
| **CHARLES BARNES, HOWARD DRAKE** | ) | |
| **and REBECCA MURATET,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Now before the Court is defendants' Motion for Summary Judgment (Dkt. # 47). In his amended complaint (Dkt. # 41), plaintiff Larry Parker ("Parker") alleges that he was improperly terminated from his job as police chief in the Town of Chelsea ("Chelsea" or the "Town"). He alleges that this termination constituted a taking of his contractual property rights and liberty interests without due process of law, as prohibited by the Fourteenth and Fifth Amendments to the United States Constitution. Plaintiff also alleges that his termination constituted a breach of the implied contract between himself and defendant Town. He further alleges that defendants are guilty of intentional and/or negligent infliction of emotional distress. While plaintiff did not specifically state a claim for relief for invasion of privacy, he argues that the amended complaint states such a claim. Defendants argue that plaintiff was an at-will employee who was terminable without cause and without procedural protections. They also contend that there was no implied contract between plaintiff and Town and that defendants' conduct was not extreme or outrageous. Thus, defendants argue that they are entitled to summary judgement on all plaintiff's claims.

# I.

Parker has been in the law enforcement business for twenty-one (21) years.  He began his employment with Chelsea as a law enforcement officer in 1995 and was appointed to the position of police chief in 2001. Dkt. # 54, Ex. D, Parker Affidavit, ¶¶ 2, 3.  Parker was appointed as police chief for an undefined term. Dkt. # 48, Ex. A, Pelletier Affidavit.  As of March 2005, defendant Kenny Weast ("Weast") was the Mayor of Chelsea. Defendants Weast, Charles Barnes ("Barnes"), Howard Drake ("Drake"), and Rebecca Muratet ("Muratet") were and are trustees and members of the Chelsea Board of Trustees.[1]

The Town of Chelsea Employee Handbook ("Employee Handbook") sets forth various employment policies, procedures, and benefits.  Section 406, entitled "Disciplinary Action Process," describes the disciplinary and termination procedures.  When an employee commits an offense, the supervisor may give a verbal and written warning to the employee.  "A member of the Board of Trustees may also prepare a written warning to be discussed in executive session.  In the event the Board approves the written warning, such warning shall be placed in the employees [sic] personnel file." Dkt. # 48, Ex. H, Employee Handbook § 406 (B).  The Employee Handbook also provides for "immediate termination" in the case of "a major violation of a Town policy or of a law."  Id. § 405(C).  At the end of section 406, in bold, the Employee Handbook reads: "Notwithstanding any other provisions of the Handbook or representations made by an employee of the Town, or any Trustee of the Town, individuals are employed on an at will basis.  this [sic] means that they may be terminated at any time with or without cause or with or without notice."  Id.  § 405.   Section 100 reiterates that Chelsea

---

[1]     Earl Knipe ("Knipe") was and is also a member of the Board of Trustees. But Knipe voted against terminating Parker's employment as police chief, and he was not named a party to this suit.

employees are employed on an at-will basis and states that the Employee Handbook does not create an employment contract between Chelsea and its employees:

> The purpose of the Handbook is to provide statements of personnel policy, practices and benefits of the Town of Chelsea ('Town'). It is designed to serve as a working guide for supervisory personnel and as a source of information for all employees of the Town. It does not constitute a legal document and nothing in this Handbook creates an express or implied right of contract of employment . . . . Notwithstanding any other provision of this Handbook or representations made by any employee of the Town, or any Trustee of the Town, individuals are employed on an at will basis. this [sic] means that they may be terminated at any time with or without cause or with or without notice.

Id. § 100. The Employee Handbook further provides: "Discharge will be determined to be in the best interest of the Town. The employee's record will indicate the reason for discharge and will show the person not eligible for rehire." Id. § 408(H). Section 407 sets forth procedures for employee grievances.

In September 2003, Parker opened a bank account, named "Chelsea Police Department Reserve Fund" ("Reserve Fund"). Dkt. # 54, Ex. D, Parker Affidavit, ¶ 4. The purpose of the Reserve Fund was to enable private citizens and businesses to make contributions to the Chelsea Police Department so that the department could make expenditures that the town budget was unable to fund. Id.

In early 2005, Assistant Chief Guess ("Guess") and reserve officers[2] Tim Schultz ("Schultz") and Allen Peper ("Peper") approached several members of the Board of Trustees to express their concerns about Parker. Guess, Schultz, and Peper told the Board that Parker would not permit them to view the checkbook for the Reserve Fund. Schultz was particularly concerned because he was the treasurer of the reserve officers. Dkt. # 48, Ex. B, Weast Deposition at 16. Guess, Schultz, and Peper also raised concerns that they were not getting the same benefits as the full-time officers and that the

---

[2]     Reserve officers in Chelsea are those who are unpaid and volunteer their time.

Reserve Fund was being used to purchase uniforms and other supplies for the full-time officers only. Id.  Guess also claimed that communication between Parker and the reserve officers was poor. Id. at 24. Drake heard from other police officers that "several of the officers were afraid to come to work because of Mr. Parker's attitude, and it was his way or the highway." Dkt. # 48, Ex. D, Drake Deposition at 18.

There is some dispute about whether the reserve officers believed that the Reserve Fund was their account, given that the word "reserve" was in the account name.  In his deposition, Peper testified that he thought the account belonged to the reserve officers:

> Q: Now, who owned [the Reserve Fund] that's shown in Exhibit 102?
> A: The reserves.
> Q: The reserve officers?
> A: Yes.

Dkt. # 54, Ex. M, Peper Deposition at 2-3.  Also, in Muratet's deposition, she testified that "Peper just began to share something about a reserve officer account, bank account for the reserve officers." Dkt # 48, Ex. C, Muratet Deposition at 67.  According to most persons, including Parker who set up the Reserve Fund, however, "the use of the word 'Reserve' in the name of the bank account meant it was money held in reserve for emergency or necessary expenditures which could not be covered by the Chelsea budget." Dkt. # 54, Ex. C, Parker Affidavit; see also Dkt. # 54, Ex. N, Bible Affidavit.  The Reserve Fund was not owned by the reserve officers, nor was it meant to benefit solely the reserve officers.  It is unclear whether Schultz and Peper's complaints about Parker stem, at least in part, from their misunderstanding about the Reserve Fund and whether this misunderstanding contributed to the Board of Trustee's decision to terminate Parker.  On the one hand, Peper's testimony shows his incorrect belief that the Reserve Fund belonged to the reserve officers.  On the other hand, according to both Muratet and Weast's depositions, Peper and Schultz never argued that Parker had misappropriated funds from the Reserve Account; Peper and Schultz merely expressed concern about

4

his refusal to show the bank statements. See Dkt. # 48, Ex. B, Weast Deposition at 46; Dkt. # 48, Ex. C, Muratet Deposition at 71, 72.

Given the complaints about Parker's role as police chief, at the town meeting on March 15, 2005, the Board went into executive session to discuss the disciplining, termination, or resignation of Parker. Dkt. # 48, Ex. F, Board Agenda. In the executive session, the Board spoke first with Schultz and Peper. When Schultz and Peper left, the Board called in Parker. Dkt. # 54, Ex. D, Parker Affidavit. Parker was not told in advance the purpose of this executive session. Id. He was present for several minutes while the Board asked him various questions. Id. The Board then returned to the regular meeting session, and Drake made a motion to terminate Parker as police chief. Weast, Barnes, Drake, and Muratet voted for his termination; Knipe voted against his termination. Dkt. # 48, Ex. G, Minutes of March 15, 2005 Meeting. Parker was terminated as of March 15, 2005. According to Parker, he was not notified of the reason for his termination at that time. Dkt. # 54, Ex. D, Parker Affidavit.

In their depositions, Weast, Barnes, Drake, and Muratet pointed to several reasons for terminating Parker: (1) Parker did not communicate well with the other officers; (2) Parker showed disrespect for the council members; and (3) Parker did not allow the reserve officers to look at or expend funds from the Reserve Fund. See Dkt. # 48, Ex. B, Weast Deposition at 34-36; Dkt. # 48, Ex. E, Barnes Deposition at 18. Weast, Barnes, Drake, and Muratet each claim that they did not speak with the public about the reason for Parker's termination. See Dkt. # 48, Ex. C, Muratet Deposition at 126-28; Dkt. # 48, Ex. D, Drake Deposition at 40-42; Dkt. # 48, Ex. E, Barnes Deposition at 38; Dkt. # 48, Ex. B, Weast Deposition at 63-65.

After his termination, Parker submitted a written grievance to the Board of Trustees. Dkt. # 54, Ex. F, Grievance Letter. He stated that he was never given any warning or explanation of his termination and that his termination was illegal. He asked the Board to reconsider his termination and reinstate him as police chief. Id. The Board of Trustees never responded to this written grievance. See Dkt. # 54, Ex. B, Knipe Deposition at 63-64; Dkt. # 54, Ex. G, Drake Deposition at 37, 40; Dkt. # 54, Ex. H, Ramsey Deposition at 48-50; Dkt. # 54, Ex. I., Muratet Deposition at 120-24.

## II.

Plaintiff brings several federal and state claims against defendants. Firstly, he argues that he was denied due process of law with respect to his protected property interest in continued employment. Secondly, he claims that defendants' conduct in terminating him infringed upon his liberty interest in his good name and reputation. Thirdly, plaintiff alleges that defendants' breached their implied contract, as created by the Employee Handbook. Finally, plaintiff seeks relief for defendants' alleged intentional and/or negligent infliction of emotional distress and their alleged invasion of his privacy. Defendants seek summary judgment on all of plaintiff's claims. With respect to the federal claims, defendants argue that, even if the Court does not grant summary judgment on all the claims, Weast, Barnes, Drake, and Muratet are entitled to summary judgment under the doctrine of absolute immunity and, alternatively, qualified immunity. With respect to the state claims, defendants also argue that Weast, Barnes, Drake, and Muratet are entitled to summary judgment because they are not the proper parties to the state claims.

## A.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986);

Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "The plain language of Rule 56(c) mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87

(1986) (citations omitted). In its review, the Court construes the record in the light most favorable to

the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998). "The

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477

U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." Id. at 251-52.

## B.

Plaintiff first alleges that he possessed a protected property right in his continued employment

as police chief and that defendants' termination of plaintiff violated his right to procedural due process

under the Fourteenth Amendment. A procedural due process claim is subject to a two-part inquiry: (1)

the Court determines whether the Fourteenth Amendment protects plaintiff's interest; and (2) if so, the

Court determines whether plaintiff was afforded the appropriate level of process. The threshold

question, therefore, is whether plaintiff had a protected property interest in his continued employment as police chief.  Continued employment can constitute a property interest; however such a property interest is created and defined by state law.  See Bd. of Regents v. Roth, 408 U.S. 564, 576-78 (1972) (ruling that a tenured public employee had a property interest in continued employment); Carnes v. Parker, 922 F.2d 1506, 1510 (10th Cir. 1991) ("A public employee has a property interest in continued employment if under state law that employee has a 'legitimate claim of entitlement' to – not merely a 'unilateral expectation' of – continued employment.").  A property interest in employment can be created by ordinance or by an implied contract. In either case, the sufficiency of the claim of entitlement is determined by reference to state law.   Bishop v. Wood, 426 U.S. 341, 344 (1976).

In arguing that plaintiff had a protected interest in continued employment, plaintiff points to an Oklahoma case, Umholz v. City of Tulsa, 565 P.2d 15 (Okla. 1977).  There, the Supreme Court of Oklahoma held that the Charter of the City of Tulsa gave the suspended police officers a sufficient expectation of continued employment to constitute a limited property interest where the Charter provided for the demotion or removal of public employees only for good and sufficient cause. Id. at 24. Here, however, Chelsea does not have a comparable charter or ordinance permitting the removal of officers only for good cause.  On the contrary, Chelsea operates under a statutory town board of trustees form of government. Dkt. # 48, Ex. A, Pelletier Affidavit.  According to Oklahoma law, "Appointments and promotions in the service of a statutory town board of trustees government shall be made solely on the basis of merit and fitness; and removals, demotions, suspensions, and layoffs shall be made solely for the good of the service."  OKLA. STAT. tit. 11, § 12-114.  This provision authorizing city managers to remove employees "solely for the good of the service" does not create a property interest in continued employment within the meaning of Article 2, Section 7 of the Oklahoma Constitution. Hall v. O'Keefe,

617 P.2d 196, 200 (Okla. 1980); Campbell v. Mercer, 926 F.2d 990, 993 (10th Cir. 1991) ("'For the good of the service' does not confer upon a city employee a property interest requiring due process protections."). Thus, plaintiff did not have a property interest in continued employment by ordinance or statute.

The Court must next determine if plaintiff had a protected property interest under an implied contract theory. Plaintiff claims that he had a protected property interest in continued employment based on the Employee Handbook. Plaintiff claims that the Board failed to follow the termination procedures set forth in the Employee Handbook; thus, his property interest was taken without due process. Under Oklahoma law, an employee handbook may form the basis of an implied contract between an employer and its employees if four traditional contract requirements exist: (1) competent parties; (2) consent; (3) a legal object; and (4) consideration. Russell v. Bd. of County Comm'rs, Carter County, 952 P.2d 492, 501 (Okla. 1997). There are two limitations on the scope of implied contracts through an employee handbook: (1) the manual alters the at-will relationship only with respect to accrued benefits; and (2) the promises in the employee manual must be in definite terms, not in the form of vague assurances. Selfridge v. Dollar Gen. Corp., Inc., 9 P.3d 695, 698 (Okla. Ct. App. 2000). Normally the existence of an implied contract is a factual question. See Dupree v. United Parcel Serv., Inc., 926 F.2d 219, 222 (10th Cir. 1992). "If the alleged promises are nothing more than vague assurances, however, the issue can be decided as a matter of law." Id.

Defendants argue that the Employee Handbook did not create an implied contract because the Town did not officially adopt the Employee Handbook. But defendants' argument runs contrary to the evidence in the summary judgment record. Plaintiff provides the agendas of several town meetings

where the Board of Trustees voted to amend and update the Employee Handbook.  Dkt. # 54, Ex. A.

This suggests that the Town did, in fact, adopt the Employee Handbook.

Defendants further argue that there was no implied contract because the Employee Handbook

contains disclaimers stating that plaintiff was an at-will employee.  The existence of a clear disclaimer

does not necessarily mean that there is no implied contract, however.  "An employer's conduct – i.e.

representations and practices – which is inconsistent with its disclaimer may negate the disclaimer's

effect." Russell, 952 P.2d at 502.  The efficacy of a disclaimer is generally a mixed question of law and

fact; however, in some cases summary judgment is appropriate.  For example, in Avery v. Hillcrest

Med. Ctr., 815 P.2d 1215, 1217 (Okla. Civ. App. 1991), the court affirmed summary judgment for the

employer on the discharged employee's breach of contract claim where (1) there were no assurances

of job security in the handbook, (2) the employee had disclaimers in the manual denying any intention

to create a contract of employment, and (3) the disclaimers were "bold and clear" and the policies were

"unambiguous."  By contrast, in Johnson v. Nasca, 802 P.2d 1294 (Okla. Civ. App.  1990), the court

reversed the lower court's grant of summary judgment for the employer on the employee's breach of

contract claim.  The court reasoned that "the handbook, when viewed in conjunction with a pattern and

practice indicating the adoption and consistent use of these procedures, may lead reasonable minds to

differing conclusions about the existence of implied contractual rights to use of the procedures." Id. at

1297.

Here, the Employee Handbook contained several disclaimers stating that it did not create an

implied contract and that employees were at-will.  See Dkt. # 48, Ex. H, Employee Handbook, §§ 100,

216, 406.  Thus, whether defendants are entitled to summary judgment on plaintiff's procedural due

process claim (and the Town on his breach of contract claim, which is discussed below) depends on

10

whether the Town engaged in employment patterns and practices that contradicted the disclaimers. According to the Employee Handbook, employees may be reprimanded, suspended, or terminated "subject to the grievance procedure allowed by the Employee Handbook." Id. § 406. The section on grievance procedures states that, if an employee feels that he has been treated unfairly, he can submit a complaint to his supervisor. Id. § 407. If the employee does so, then "[t]he supervisor/Trustee *shall* attempt to resolve the problem promptly and fairly, and give his/her decision to the employee within ten working days." Id. (emphasis added). Also, if the employee is dissatisfied with the Trustee's decision, the employee may choose to submit the grievance in writing to the Board of Trustees. Then, "[t]he Board of Trustees *shall* give a decision to the supervisor and the employee within ten working days." Id. (emphasis added). The use of the word "shall" in the grievance procedure raises a genuine issue of material fact as to whether the Town adopted mandatory procedures for termination. In addition, plaintiff provides evidence that the defendants themselves believed that they were supposed to comply with the procedures set forth in the Employee Handbook. See Dkt. # 54, Ex. B, Knipe Deposition at 63-64; Dkt. # 54, Ex. H, Ramsey Deposition at 48-50. Thus, plaintiff has shown that there is a genuine issue of material fact as to whether there was an implied contract between plaintiff and the Town.

There is no question that the Board of Trustees did not comply with the grievance procedures described above. Plaintiff submitted a letter addressed to Knipe and the Board, but the Board did not respond to that letter. Even the defendants themselves admit that there should have been a response to plaintiff's letter. See Dkt. # 54, Ex. I, Muratet Deposition at 120-24. Since defendants did not comply with the grievance procedures set forth in the Employee Handbook, there is a genuine issue of material

fact as to whether plaintiff was denied his right to procedural due process with respect to his property interest in continued employment.

**C.**

Defendants argue that they are entitled to summary judgment on plaintiff's substantive due

process claim.  However, in his response to the defendants' motion, plaintiff does not address the issue

of substantive due process.  Moreover, in the amended complaint, there is no explicit reference to

substantive due process.[3]  Therefore, the Court determines that plaintiff has not stated a claim or argued

that defendants' actions constituted a violation of his right to substantive due process, and it will not

address that issue.

**D.**

Next, plaintiff alleges that defendants' conduct in terminating him violated his liberty interest

under the Fifth Amendment.  In the employment context, liberty interests involve (1) the protection of

the employee's good name, reputation, honor, and integrity, and (2) the employee's freedom to take

advantage of other employment opportunities.  Conoway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).

To be actionable, statements which infringe upon a liberty interest in plaintiff's good name and

reputation as it affects plaintiff's property interest in continued employment must: (1) impugn plaintiff's

good name, reputation, honor, or integrity, (2) be false, (3) occur in course of terminating plaintiff, and

(4) be published.  Workman v. Jordan, 32 F.3d 475, 480 (10th Cir. 1994); Stidham v. Peace Officer

Standards and Training, 265 F.3d 1144, 1153 (10th Cir. 2001).  "Damage to one's reputation alone  .

. . is not enough to implicate due process protections." Jensen v. Redevelopment Agency of Sandy City,

998 F.2d 1550, 1558 (10th Cir. 1993).

---

[3]     Plaintiff's amended complaint merely states that defendants' conduct constituted a violation
of due process under the Fourteen and Fifth Amendments to the United States
Constitution. The complaint did not specify whether plaintiff claims that his procedural or
substantive due process rights were violated.

Here, plaintiff alleges that his reputation suffered due to the alleged publication of a false statement. Specifically, plaintiff argues that defendants fired him based on their mistaken belief that he had misappropriated funds in the Reserve Fund and then published that incorrect information. To support this argument, plaintiff provides only his affidavit and the affidavit of Mary Lu Bible ("Bible"), a former Chelsea dispatcher. According to Parker's Affidavit, "In the course of my termination, the Defendants publicized the false charges that I was guilty of misappropriating funds." He further contends, "Publishing the false charges against me has damaged my reputation in general – and particularly in the law enforcement community . . . . I have applied for numerous law enforcement jobs, but have been unable to be employed in law enforcement." Dkt. # 54, Ex. D, Parker Affidavit, ¶¶ 17, 18. In her affidavit, Bible, states: "I believe the accusations against Chief Parker were published or reported by the Defendant Board of Trustee members." Dkt. # 54, Ex. N, Parker Affidavit, ¶ 5. However, these conclusory remarks are not sufficient to overcome summary judgment. Fed. R. Civ. P. 56(e); Dart Indus. v. Plunkett Co. of Okla., 704 F.2d 496, 498 (10th Cir. 1983). Plaintiff fails to set forth specific facts that defendants made false statements about plaintiff and that such false statements were published. Plaintiff's argument rests solely on the fact that Schultz and Peper incorrectly believed that the Reserve Fund was an account for the reserve officers. Plaintiff does not provide evidence that this misunderstanding was, in fact, the reason for his termination, and he does not address the other reasons articulated by defendants for his termination. Also, plaintiff fails to provide any evidence of publication, other than the conclusory statements in his affidavit. In fact, the defendants' testimonies indicate that, consistent with city council policy, defendants did not discuss the reason for plaintiff's termination with any member of the public. Plaintiff's reputation may have suffered as a result of the rumors surrounding his termination, but there is no evidence that defendants made any false statements

about plaintiff or published those false statements.  Thus, the Court will grant defendants' motion for summary judgment on plaintiff's liberty interest claim.

### E.

Defendants argue that, even if the Court does not grant summary judgment on all of plaintiff's federal claims, Weast, Barnes, Drake, and Muratet (the "individual defendants") are entitled to summary judgment on those claims based on the affirmative defense of absolute immunity.  Like federal, state and regional legislators, local legislators are entitled to absolute immunity from civil liability under § 1983 for their legislative activities.  Brogan v. Scott-Harris, 523 U.S. 44, 44 (1998).  Absolute immunity attaches to all actions taken "in the sphere of legitimate legislative activity."  Tenney v. Brandhove, 341 U.S. 367, 376 (1951).  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  Brogan, 523 U.S. at 54.  Not all actions taken at a legislative meeting by a local legislator are legislative for purposes of immunity.  Kamplain v. Curry County Bd. of Comm'rs, 159 F.3d 1248, 1251 (10th Cir. 1998).  The Tenth Circuit has held that an act is legislative for absolute immunity purposes when it concerns the enactment or promulgation of public policy.  Id. at 1252.  Legislators' employment decisions, by contrast, are merely administrative.  Id. (citing a Pennsylvania case that held that a municipality's employment decisions are essentially administrative in nature); Brogan, 523 U.S. at 56 (holding that the "termination of a [government] position, *unlike the hiring or firing of an particular employee*," constituted a legislative action (emphasis added)).   Here, the Board of Trustee's decision to fire plaintiff was administrative in nature; thus, the individual defendants are not absolutely immune from liability on plaintiff's claims.

**F.**

In the alternative to absolute immunity, defendants argue that the individual defendants are entitled to summary judgment on plaintiff's federal claims based on the doctrine of qualified immunity. Since the Court will grant summary judgment on plaintiff's liberty interest claim and there is no substantive due process claim, the Court must address the issue of qualified immunity only with respect to plaintiff's procedural due process claim.

A public official performing a discretionary function enjoys qualified immunity in a civil action for damages, provided his or her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001). As qualified immunity provides officials with "immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the "courts should resolve the purely legal question raised by a qualified immunity defense at the earliest possible stage in litigation," Gross, 245 F.3d at 1155 (citations omitted).

If a defendant asserts a qualified immunity defense, the Court must determine whether the plaintiff satisfies a "heavy two-part burden." Gross, 245 F.3d at 1155 (citations omitted). In particular, the plaintiff must establish that (1) "the defendant's actions violated a constitutional or statutory right" and (2) "the right at issue was clearly established at the time of the defendant's unlawful conduct." Id. In determining whether a right was clearly established, the Court must assess "the objective legal reasonableness of the action at the time of the alleged violation and [ask] whether the 'right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" Gross, 245 F.3d at 1156 (quoting Wilson v. Layne, 526 U.S. 603, 619 (1999)). If the plaintiff fails to satisfy either part of this two-part inquiry, the Court must grant the defendant qualified immunity. Id.

at 1156.  "If, and only if, the plaintiff meets this two-part test does [the] defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."  <u>Nelson v. McMullen</u>, 207 F.3d 1202, 1206 (10th Cir. 2000).

Here, as addressed above, plaintiff claims that defendants violated his procedural due process rights in failing to comport with policies set forth in the Employee Handbook.  However, the constitutional right to procedural due process in the context of an implied contract is not so clearly established that reasonable officials would have understood that their conduct violated that right.  While the Supreme Court has made clear that an implied contract can create a protected property interest, this determination is made under state law. <u>See</u> <u>Bishop</u>, 426 U.S. at 344.  Under Oklahoma law, it is not clearly established that an employee handbook creates an implied contract when the handbook contains clear disclaimers.  On the contrary, the inquiry of whether an implied contract exists is heavily fact-dependent and is often a close call.  Here, the individual defendants did not act in a manner that was clearly unconstitutional.  Reasonable officials would not necessarily have understood that their conduct violated plaintiff's right to procedural due process.  Therefore, the Court must grant the individual defendants, in their personal capacity, qualified immunity and summary judgment as to plaintiff's procedural due process claim.

## G.

In addition to the federal claims, plaintiff argues that he is entitled to relief for the Town's alleged breach of an implied contract.  Whether there was an implied contract between plaintiff and Town is discussed at length in Section II(B).  As addressed in that section, there is a genuine issue of material fact as to whether there was an implied contract between the parties as a result of the Employee

17

Handbook.  Therefore, the Court denies defendants' motion for summary judgment on plaintiff's breach of contract claim against the Town.[4]

### H.

Plaintiff also seeks relief for defendants' alleged intentional infliction of emotional distress. Oklahoma courts have recognized a cause of action for intentional infliction of emotional distress, also known as the tort of outrage.  See, e.g., Gaylord Entm't Co. v. Thompson, 958 P.2d 128, 149 (Okla. 1998).  The action is governed by the narrow standards laid out in the Restatement Second of Torts, § 46. Id.  In Breeden v. League Servs. Corp., 575 P.2d 1374 (Okla. 1978), the Oklahoma Supreme Court explained,

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arounse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

Id. at 1376.

A plaintiff alleging intentional infliction of emotional distress must establish the following elements: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the

---

[4]     In his amended complaint, plaintiff asserts, "An implied contract existed between the Plaintiff and the Defendant Town of Chelsea." Dkt. # 41, ¶ 29.  He does not allege that the individual defendants were parties to that contract.  However, in asserting his cause of action for breach of contract, plaintiff seeks "recovery of his actual damages against the Defendants, jointly and severally, . . . and for recovery of attorney's fees and costs against all Defendants."  Id. at 10.  Since plaintiff never claims nor presents any evidence that the individual defendants were parties to the alleged implied contract, they cannot be liable for breach of contract.  Therefore, the Court interprets plaintiff's breach of contract claim to be against the defendant Town, not the individual defendants.

emotional distress was severe.  <u>Trentadue v. United States</u>, 397 F.3d 840, 856 (10th Cir. 2005) (applying Oklahoma law); <u>Computer Publ'ns, Inc. v. Welton</u>, 49 P.3d 732, 735 (Okla. 2002).  Under Oklahoma law, the trial court must assume a "gatekeeper role" and make an initial determination that the defendant's conduct "may be reasonably regarded as sufficiently extreme and outrageous to meet the Restatement § 46 standards." <u>Trentadue</u>, 397 F.3d at 856 n.7.  If reasonable persons could reach differing conclusions in the assessment of the disputed facts, the Court should submit the claim to the jury to determine whether the defendant's conduct could result in liability.  <u>Id.</u> The Court is to make a similar threshold determination with regard to the fourth prong, the presence of severe emotional distress.  <u>Id.</u>

It is clear that plaintiff has no evidence that would support a claim for intentional infliction of emotional distress.  The summary judgment record does not show that defendants engaged in extreme or outrageous behavior, or that plaintiff suffered severe emotional distress.  Case law sets a high standard for finding that a defendant-employer engaged in extreme and outrageous behavior.  <u>Merrick v. N. Natural Gas Co.</u>, 911 F.2d 426, 432-33 (10th Cir. 1990) ("Insubordination, yelling, hostile reactions and the hurt feelings naturally accompanying such conduct do not give rise to a cause for intentional infliction of emotional distress.  We hold that [defendants] were involved in an ordinary employer-employee conflict"); <u>Eddy v. Brown</u>, 715 P.2d 74 (Okla. 1986) (repeated insulting actions by other employees and supervisors that caused emotional harm were not so severe or pervasive in the setting in which they occurred to justify submitting claim to jury).  In claiming that defendants are liable for intentional infliction of emotional distress, plaintiff relies solely on the fact that he was terminated and suffered harm to his reputation as a result.  But there is no evidence that defendants' behavior rose to the level of extreme or outrageous conduct.  Regardless of whether they made a wise decision to

terminate plaintiff, defendants were entitled to review his role as police chief without incurring liability for emotional distress. Additionally, the record is completely lacking in evidence that plaintiff suffered severe emotional harm because of any actions by defendants. Therefore, the Court grants defendants' motion for summary judgment as to plaintiff's claim for intentional infliction of emotional distress.

## I.

In the alternative to his claim of intentional infliction of emotional distress, plaintiff alleges that defendants are liable for negligent infliction of emotional distress. Oklahoma does not recognize a tort claim for negligent infliction of emotional distress independent from a common law negligence claim. Lockhart v. Loosen, 943 P.2d 1074, 1081 (Okla. 1997); see also Wilson v. Muckala, 303 F.3d 1207, 1213 (10th Cir. 2002) (applying Oklahoma law). Further, in Oklahoma, damages for emotional distress are recoverable only if accompanied by physical injury. Wilson, 303 F.3d at 1213 (citing Ellington v. Coca Cola Bottling Co. of Tulsa, 717 P.2d 109, 111 (Okla. 1986)). Since plaintiff did not allege negligence, and has not pled or raised a genuine issue of material fact as to the necessary element of physical injury, defendants are entitled to summary judgment on plaintiff's claim of negligent infliction of emotional distress. Id.

## J.

Plaintiff also claims that he has a cause of action for invasion of privacy and casting plaintiff in a false light. However, plaintiff failed to state this claim in his amended complaint. As it stands, the amended complaint is not sufficient to include a claim for invasion of privacy. Therefore, the Court grants defendants' motion for summary judgment on plaintiff's insufficient invasion of privacy claim.

**K.**

Finally, defendants argue that, if they are not granted summary judgment on all plaintiff's state claims, the individual defendants are entitled to summary judgment on those claims because they are not the proper parties to the state law claims.  Defendants point to the Oklahoma Governmental Tort Claims Act ("GTCA"), which expressly prohibits joining municipal employees as party defendants to suits against municipalities. OKLA. STAT. tit. 51, § 163.  However, as the name implies, GTCA concerns only tort claims.  Since the Court will grant summary judgment on plaintiff's intentional infliction of emotional distress claim, the only tort claim, it need not determine whether GTCA applies here.  The GTCA does not apply to the breach of contract claim; therefore, the Court rejects defendants' argument that the individual defendants are not the proper parties with respect to plaintiff's breach of contract claim.

**III.**

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment (Dkt. # 47) is **granted in part and denied in part**; it is granted as to all of plaintiff's claims except his procedural due process and breach of contract claims against the Town of Chelsea.  All individual defendants are terminated as parties to this action.

**DATED** this 29th day of September, 2006.

_Claire V Eagan_

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT